# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MONICA LAVETTE HINTON,      )
                                    )
               Plaintiff,       )      No. 3:11-0158
                                    )      CHIEF JUDGE HAYNES
v.                                    )
                                    )
STATE OF TENNESSEE,        )
DEPARTMENT OF CHILDREN'S   )
SERVICES,                   )
                                    )
              Defendant.      )

# MEMORANDUM

Plaintiff, Monica Lavette Hinton, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") against the Defendant, the State of Tennessee Department of Children's Services ("DCS"), her former employer. Plaintiff asserts claims for sexual harassment and retaliation. Plaintiff alleges, in essence, that she was sexually harassed by Jennifer Hamilton, her direct supervisor, and was terminated in retaliation for her filing a complaint with the Equal Employment Opportunity Commission ("EEOC").

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 11), contending, in sum: (1) that Plaintiff cannot establish a *prima facie* showing of same-sex sexual harassment because Hamilton is heterosexual; (2) that Plaintiff's proof fails to show any severe or pervasive harassment; (3) that Defendant's prompt corrective action in response to Plaintiff's complaints precludes relief; and (4) that Plaintiff's retaliation claim fails because she

1

cannot establish a causal connection between Plaintiff's protected activity and any adverse action because Plaintiff abandoned her job. In response, Plaintiff asserts that she has submitted sufficient evidence in support of her claims of same sex sexual harassment and retaliation.

For the reasons set forth below, the Court concludes that Defendant's motion for summary judgment should be granted. Plaintiff's proof is insufficient to support a judgment for sexual harassment or retaliation under Title VII.

## FINDINGS OF FACT[1]

In July 1995, Plaintiff was hired by the Tennessee Department of Children's Services as a social counselor 1 case manager. (Docket Entry No. 1, Complaint, at ¶10). Around December 4, 2004, Plaintiff was promoted to the position of team coordinator in the Special Investigations Unit ("SIU") for west Tennessee. Id. About the same time, Jennifer Hamilton was hired as an SIU team coordinator to supervise east Tennessee. Id. at ¶12. As team coordinators, Plaintiff and Hamilton supervised two team leaders and approximately six or seven case managers within their divisions. Id. at ¶10; Docket Entry No. 13, Defendant's Statement of Undisputed Facts, at ¶2. At the time that Plaintiff was hired as a team coordinator, Carla Aaron was the SIU's director. Id. at ¶13.

SIU investigates allegations of abuse of children by institutions. (Docket Entry No. 16,

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Because Plaintiff did not file a response to Defendant's Statement of Undisputed Facts (Docket Entry No. 13) in accordance with Local Rule 56.01(c), Defendant's proffered statements of facts are undisputed for purposes of summary judgment, pursuant to Local Rule 56.01(g).

Hamilton Affidavit, at ¶2). Team coordinators are required to read the cases prepared by case managers and to ensure that investigative policies have been followed as well as to determine that "they have enough information in the case so it can be closed." (Docket Entry No. 13, at ¶4). Further, team coordinators are "on call twenty four hours a day, seven days a week" because a "child could die, [a] foster home needed to be closed, [or] children needed to be removed," and these situations require immediate action. Id. at ¶5.

After being hired as team coordinator in December 2004, Plaintiff and Hamilton became friends outside of work, and would "have drinks at the different clubs and bars". Id. at ¶ 10. On two or more occasions, Plaintiff stayed overnight at Hamilton's home to avoid driving home intoxicated. Id. at ¶11. Both Plaintiff and Hamilton are heterosexuals. Id. at ¶¶6-7. Hamilton has neither been in a homosexual relationship, nor expressed a desire, nor has been known or rumored to be in a homosexual relationship. Id. at ¶¶8-9; Docket Entry No. 18-6, Plaintiff Deposition, at 33. There was not any sexual conduct during any of Plaintiff's overnight stays at Hamilton's home, except that Plaintiff alleges that on one occasion, she became uncomfortable when Hamilton "crawled" into bed with her during the morning. Id. at ¶12; Docket Entry No. 18-6, Plaintiff Deposition, at 41-43.

In June 2005, Hamilton became SIU's director. Id. at ¶13. As SIU director, Hamilton supervised Plaintiff and Kathleen Wallace. Id. at ¶14. Wallace filled the team coordinator position vacated by Hamilton. Id. After Hamilton became director of SIU, Plaintiff and Hamilton continued to socialize go out for drinks. Id. at ¶15; Docket Entry No. 18-25.

Plaintiff alleges after June 2005, Hamilton began calling her more frequently concerning topics unrelated to work and also began pressuring Plaintiff to allow Hamilton to accompany her

3

on work-related trips to Memphis, Tennessee, and requesting hotel rooms adjoining Plaintiff's room. (Docket Entry No. 1, at ¶¶16-18; Docket Entry No. 18-6, Plaintiff Deposition at 60-62). Yet, Plaintiff's telephone records reflect that from February 2005 to September 2005, Hamilton did not make any calls to Plaintiff and Plaintiff called and spoke to Hamilton for an average of eighty-nine minutes a month. (Docket Entry No. 18-25, at 4-7). From October 2005 to December 2005, Plaintiff called Hamilton for a total of sixty-nine minutes, while Hamilton called Plaintiff a total of 240 minutes. Id. at 2, 7. From January 11, 2007 to January 31, 2007, Hamilton called Plaintiff nineteen times for a total of 173 minutes, averaging nine minutes a call. Id. at 3.[2] According to Sarah Davis, Hamilton's administrative assistant, Hamilton traveled occasionally to Memphis for training or a conference, but did not travel there as frequently as Plaintiff. (Docket Entry No. 18-5, Davis Deposition, at 6-7, 23-24).

Plaintiff asserts that Hamilton referred to the two of them as "non-practicing lesbians" on a number of occasions in the presence of others. (Docket Entry No. 1, at ¶19-21). According to Plaintiff, Hamilton "cornered" Plaintiff to question Plaintiff about her relationship with a man, and once stated to Plaintiff, "If you change your hairstyle, I will date you." (Docket Entry No. 18-6, Plaintiff Deposition, at 48-52). Plaintiff, however, fails to cite testimony from any other witness to corroborate these statements. Plaintiff asserts that once in Memphis, Plaintiff told Hamilton that she did not want any friends at DCS. (Docket Entry No. 18-6, Plaintiff Deposition, at 134). While discussing an investigation into Plaintiff's use of her work cell telephone, Hamilton told Plaintiff that she loved Plaintiff and "if it came to [Hamilton's] job or

---

[2] According to Defendant, Plaintiff only produced in discovery her telephone records from 2005, one month in 2006 and one month in 2007.

4

[Plaintiff's] [Hamilton] would give her job up." Id. at 154-55.

According to Plaintiff, she and Hamilton remained friends until the spring or summer of 2006 or 2007. (Docket Entry No. 13, at ¶16). While working in Memphis, Hamilton traveled with Plaintiff, Plaintiff's twelve-year-old daughter, and her daughter's friend on a gambling trip to Tunica, Mississippi. Id.; Docket Entry No. 18-6, Plaintiff Deposition, at 58-59, 64-65). Plaintiff received free hotel rooms in Tunica each month, and Plaintiff and Hamilton have shared a room in the past without incident. Id. at ¶18.

Plaintiff suspected Hamilton might be sexually interested in her, but invited Hamilton to stay in her room and share a bed. Id. at ¶¶19-20. While Plaintiff was gambling in the casino, Hamilton approached Plaintiff and informed her that she was going to the hotel room to sleep. Id. at ¶22. Plaintiff informed Hamilton that she would "be up later". Id. at ¶23. Hamilton returned to the room and went to sleep in one bed, while Plaintiff's daughter and daughter's friend were asleep in the other bed. Id. at ¶24.

Plaintiff returned to the hotel room and entered the bed where Hamilton was already asleep. Id. at ¶25. Plaintiff then fell asleep. Id. at ¶26. Plaintiff alleges that Hamilton awakened her about an hour later by touching Plaintiff's shoulder, and moving down to Plaintiff's elbow for "a second or two." Id. at ¶¶27-28. Hamilton's eyes remained closed and she rolled over. Id. at ¶29. Plaintiff then jumped out of bed, stood for a couple of seconds, and "laid back down on top of the covers." Id. at ¶30. Plaintiff did not mention the alleged touching incident to Hamilton or anyone else until approximately a year later. Id. at ¶31. Plaintiff also did not notify DCS until she filed an internal complaint on or about June 22, 2009. Id. at ¶32.

According to DCS policy, case managers are limited to eleven cases a month. Id. at ¶38.

5

Carla Aaron, the executive director of child safety for DCS stated that Plaintiff was instructed that her case managers should not exceed this cap. Id. at ¶41. On March 20, 2008, Plaintiff was aware that her case managers were likely to exceed their eleven cases before the end of the month. Id. at ¶40. The next week Plaintiff went on annual leave through March 28, 2008. Id. at ¶42; Docket Entry No. 18-1, Aaron Deposition at 25-26. Before her leave, Plaintiff made arrangements for Wallace to cover her work while she was on leave. (Docket Entry No. 18-1, Aaron Deposition at 21; Docket Entry Nos. 18-2, 18-3).

Upon her return from leave, Hamilton asked Plaintiff to travel to Memphis on March 31, 2008, or to send someone to Memphis to take care of the eleven cases, but Plaintiff yelled at Hamilton and did neither. (Docket Entry No. 13 at ¶¶ 44-45, 47). As a result, Plaintiff's case managers exceeded their cap, and Plaintiff received a written warning for her failure to take corrective action. Id. at ¶42, 46. On April 13, 2008, Hamilton informed Plaintiff that she was aware that Plaintiff had yelled at other staff members in the past and that such future conduct would warrant disciplinary action. Id. at ¶48-49.

Defendant asserts that months later, Hamilton, Aaron, and others experienced problems with Plaintiff's work performance. Defendant cites the following: (1) despite the twenty-four-hour nature of her job, Plaintiff was often difficult to reach on either her work telephone or her personal cell telephone; (2) Plaintiff discussed confidential matters in public; (3) Plaintiff often missed meetings and was sometimes found in her automobile either talking on her cell phone or sleeping; and (4) Plaintiff sent belligerent emails to Hamilton. Id. at ¶¶50-55, 57; Docket Entry No. 15, Greer Affidavit, at ¶11. In June 2008, because Plaintiff and Wallace were purportedly underperforming, Hamilton instructed Plaintiff and Wallace to use sign-in/sign-out sheets. Id. at

6

¶56. Plaintiff alleges that these measures were reprimands and were motivated solely by Hamilton and Aaron's joint desire to manipulate and embarrass Plaintiff. (Docket Entry No. 1, Complaint, at ¶34). Yet, Plaintiff does not submit any proof for these allegations.

On August 12, 2008, Plaintiff requested a meeting with Bonnie Hommrich, DCS's deputy commissioner to discuss work issues. (Docket Entry No. 13, at ¶58). At this meeting, Plaintiff did not mention being sexual harassed nor being called excessively by Hamilton. Id. at ¶59. At the conclusion of this meeting, Plaintiff was directed to be available by telephone, provide notification when she would be out sick, and respond to emails. Id. at ¶60. Plaintiff testified that the stress caused by Hamilton's harassment was causing her physical and mental injury and as a result, the day after the meeting with Hommrich, Plaintiff went on sick leave for approximately two months. (Docket Entry No. 18-6, Plaintiff Deposition at 144-45; Docket Entry No. 13, at ¶61).

On April 29, 2009, Plaintiff took three days of leave without arrangements for mailing of closure notifications. (Docket Entry No. 13 at ¶64). These notifications are necessary to prevent children from being placed in homes under investigation, and although these notifications are expected to be sent within twenty-four hours, Plaintiff waited two days to send them after returning to work on May 4, 2009. Id. at ¶¶65-67. As a result of this delay, a child was placed at a questionable facility in the interim and was later relocated to a different facility. Id. at ¶¶67-68. Plaintiff alleges that this two-day delay was a result of a lack of guidance from her superiors as to when notices were to be sent and that her time was spent on other aspects of her job. (Docket Entry No. 1, at ¶53-54). Plaintiff, however, does not present proof for this allegation.

On April 29, 2009, Hamilton and Aaron noted that thirty nine of Plaintiff's 101 cases

7

were not in compliance with DCS policy that requires that "all contacts must be documented within thirty days of contact," as well as fifty-five cases that lacked documented supervisory contact or supervisory meetings. (Docket Entry No. 18-18; Docket Entry No. 18-1, Aaron Deposition at 46-47, 52, 69-70). On May 4, 2009, Aaron met with Hamilton, Wallace, and Plaintiff to discuss these documentation problems. (Docket Entry No. 18-1, Aaron Deposition, at 69-70). At this meeting, Aaron noted that Plaintiff and Hamilton were not providing the required documentation in connection with their cases. Id. at 69-73. During this meeting, Plaintiff did not mention being sexually harassed by Hamilton. (Docket Entry No. 13, at ¶76). Plaintiff and Wallace, however, complained that Hamilton excessively called them after work hours. Id. at ¶¶74-75; Docket Entry No. 18-1, Aaron Deposition at 55-56.

On May 25, 2009, after a child died in DSC custody, Plaintiff could not be reached. (Docket Entry No. 18-6, Plaintiff Deposition at 162, 164-65). Plaintiff also missed a "death of a child" call in November or December 2008. Id. at 162. Plaintiff admits that she was unaware of any employees at her level who have missed a "death of a child" call. Id. at 163.

On May 29, 2009, Aaron issued a written warning to Plaintiff and Wallace regarding the lack of documentation discussed at the May 4, 2009 meeting. (Docket Entry No. 18-1, Aaron Deposition, at 45-46, 50, 53). On June 15, 2009, Plaintiff was presented with a recommendation for a one-day suspension and was provided with a corrective action plan to improve her performance due to her failures to respond to the "death of a child" call in May 2009 and to send the closure notifications. (Docket Entry No. 13, at ¶¶77-80; Docket Entry No. 18-1, Aaron Deposition, at 64-66).

On June 22, 2009, Plaintiff filed a complaint with DCS's Division of Diversity

8

Initiatives, asserting claims of sexual harassment and harassment by Hamilton and Aaron

(Docket Entry No. 18-7). An investigation of Plaintiff's claims began on June 23, 2009.

(Docket Entry No. 13, at ¶82).

On July 8, 2009, Plaintiff served her one-day suspension. Id. at ¶84. Instead of returning

to work after her suspension, Plaintiff requested and was granted FMLA leave for depression. Id.

On August 31, 2009, Plaintiff filed a charge of discrimination based on sex and retaliation with

the Tennessee Human Rights Commission and the EEOC. (Docket Entry No. 18-9).

After exhausting her sick leave, Plaintiff requested paid leave from the sick leave bank

that she received until the Department of Children's Affairs discovered that Plaintiff was

working at the restaurant she owned and operated. (Docket Entry No. 13, at ¶¶85-86, 88). As

sick leave recipients are prohibited from gaining secondary income, Plaintiff was placed on

"unapproved leave" for the next six months. Id. at ¶¶89, 94. Plaintiff testified that she did not

receive any income from her family operated restaurant. (Docket Entry No. 18-6, Plaintiff

Deposition at 185). According to Plaintiff, in the evenings she collected the money and

deposited the restaurant's monies into the bank. Id. at 186. After this six month leave, Plaintiff

did not return to work on June 25, 2010 as directed, and was terminated in September 2010.

(Docket Entry No. 13, at ¶95; Docket Entry No. 18-10). On October 12, 2010, Steve Hovies, the

division director, issued a final report concluding that there was not any evidence to support

Plaintiff's claims for sexual harassment or retaliation. (Docket Entry No. 13, at ¶83).[3]

_____

[3] In response to the Defendant's motion for summary judgment, Plaintiff disputes the report's findings and asserts that Hovies failed to consider evidence of sexual harassment as found by the investigator, Arlene Martin-Norman, citing Martin-Norman's deposition testimony. (Docket Entry No. 21 at 2-5). Plaintiff, however, did not file the deposition as part of the record, and thus, the Court cannot consider this unsupported assertion. Compare Fed. R. Civ. P.

9

## II. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [she] had to come forward with all of [her] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not

---

56(c)(1)(A) <u>and</u> Local Rule 56.01 (f) (defining the record to "include deposition transcripts...filed in support of or in opposition to the motion...").

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable

opportunity for discovery, the party opposing the motion must make an affirmative showing of

the need for additional discovery after the filing of a motion for summary judgment. Emmons v.

McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data

Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of 'the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any,' which
> it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e
> find no express or implied requirement in Rule 56 that the moving party support
> its motion with affidavits or other similar materials negating the opponent's
> claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying

Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of

material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting

Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant

has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the

11

nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted). Moreover, the Court of Appeals Explained that:

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

\*     \*     \*

12

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:
In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . ..'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.

13

Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.     Complex cases are not necessarily inappropriate for summary judgment.

2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.     The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

14

6.      As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.      The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## A. TITLE VII SEXUAL HARASSMENT CLAIM

Under Title VII it is unlawful for an employer to discriminate against any individual on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).  In a disparate

15

treatment case of sex discrimination, a plaintiff is "required to demonstrate that the adverse employment decision would not have been made 'but for' her sex." Simon v. City of Youngstown, 73 F.3d 68, 70 (6th Cir. 1995) (citation and internal quotes omitted). A plaintiff may prove discrimination by either direct evidence or circumstantial evidence. Johnson v. Kroger Co., 319 F.3d 858, 864–65 (6th Cir.2003).

Absent direct evidence of discrimination,[4] cases are subject to the McDonnell Douglas three-part, burden-shifting analysis: (1) the plaintiff must establish a *prima facie* case of discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was pretextual. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); accord Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Kent County Sherriff's Ass'n v. Kent County, 826 F.2d 1485, 1492 (6th Cir. 1987) (citing McDonnell Douglas and Burdine). The burden of persuasion remains with the plaintiff at all times. Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir. 1990). Here, the evidence is primarily indirect evidence and the McDonnell Douglas analysis applies.

To establish a *prima facie* case of same-sex sexual harassment or a sexually hostile work environment under Title VII, Plaintiff must prove: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment created a hostile work environment; and (5) that the employer

---

[4] It should be noted that McDonnell Douglas formulations establishing a *prima facie* case of discrimination is inapplicable to direct evidence cases. As one court stated, [d]irect evidence and the McDonnell Douglas formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." Blalock v. Metal Trades, Inc., 775 F.2d 703, 707 (6th Cir.1985).

16

failed to take reasonable care to prevent or correct any sexually harassing behavior. Bowman v. Shawnee State Univ., 220 F.3d 456, 462-63 (6th Cir. 2000) (affirming summary judgment despite proof of "a litany of perceived slights and abuses" including sexually offensive language). To be actionable, sexual harassment must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. Id. The Court is also required to consider if the plaintiff engaged in similar conduct. Id.

If these elements are proven, "[t]he burden . . . shift[s] to the defendant to articulate some legitimate, nondiscriminatory reasons for the plaintiff's rejection." McDonnell Douglas, 411 U.S. at 802. "The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for [its actions.]" Burdine, 450 U.S. at 255. The defendant "need not persuade the [trier of fact] that it was actually motivated by the proffered reasons," id. at 254, but "only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. at 257. The defendant's burden is, thus, one of production; not persuasion. Id. at 254-55. Although the burden of production shifts to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her] remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (citation omitted).

Once the defendant meets this burden, the plaintiff must show that the employer's proffered reason is pretextual. Id. "It is not enough . . . to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." Id. at 519 (emphasis omitted). But "[a] plaintiff does not need to introduce additional evidence of discrimination to prevail on the merits." Kline v. Tennessee Valley Auth., 128 F.3d 337, 347

17

(6th Cir. 1997). Discrimination can be found once a *prima facie* case is established along with the disbelief of the proffered reasons for the adverse employment action. Id. To challenge the employer's explanation for an adverse employment action, the plaintiff must show, by a preponderance of the evidence, "either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." Kocsis v. Mulit-Care Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1993).

The Supreme Court in Hicks made clear that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 509 U.S. at 518 (citation omitted). Moreover, the Court held that "it is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." Id. at 519 (emphasis in original).

Under Title VII, a "workplace [that] is permeated with 'discriminatory intimidation, ridicule, and insult,' and that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'" violates the Act. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)). For a hostile environment claim under Title VII, the plaintiff must establish more than a "mere utterance of an . . . epithet which engenders offensive feelings in an employee," to be actionable. Id. As the Supreme Court further explained that:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

18

Id. at 223.

Plaintiff must show that a reasonable person would consider the offensive conduct pervasive, and Plaintiff must subjectively experience the offensive conduct. Harris, 510 U.S. at 21-22. The harassing acts must be "either in concert or with a regularity that can reasonably be termed pervasive." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2nd Cir.1987). Yet, the Sixth Circuit explained that sex-based comments need not be directed at a plaintiff to prove a Title VII violation. See Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997).

Defendant contends that Plaintiff cannot establish her *prima facie* case of same-sex harassment because Plaintiff fails to show that Hamilton is a homosexual. Same-sex harassment claims may be brought in three instances: "(1) where the harasser making sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of men in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" Vickers v. Farfield Med. Ctr., 453 F.3d 757, 765 (6th Cir. 2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998)); Ellsworth v. Potluck Enter., Inc., 624 F. Supp.2d 868, 876 (M.D. Tenn. 2009).

Regardless of the evidentiary route chosen, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" Oncale, 523 U.S. at 81. In Ellsworth, the district court commented:

> In Oncale, the Supreme Court noted that courts infer that harassment is based on sex when conduct involves explicit or implicit proposals of sexual activity between members of the opposite sex. "The same chain of inference would be available to a plaintiff alleging

19

same-sex harassment, *if there were credible evidence that the harasser was homosexual.*" The Supreme Court's ruling in Oncale is consistent with a previous Sixth Circuit holding that, if a male propositions another male because of sexual attraction, there is a presumption that the behavior is a form of harassment that occurs because of sex. See Yeary v. Goodwill Indus.- Knoxville, Inc., 107 F.3d 443, 448 (6th Cir. 1997). Further, after Oncale, the Sixth Circuit ruled that, when a same-sex harasser is homosexual, a court may conclude that the harassment would not have been directed at both sexes, and, thus, is based on sex. See E.E.O.C. v. Harbert-Yeargin, Inc., 266 F.3d 498, 522 (6th Cir. 2001) (Guy, J., concurring in part and dissenting in part, and providing the opinion of the court with respect to the same-sex harassment claim).

Id. (emphasis added and citations omitted).

Here, Plaintiff relies on the evidentiary method that the alleged harasser acted out of sexual desire. Plaintiff cites as specific acts of sexual harassment the following: daily calls from Hamilton concerning topics unrelated to work; multiple attempts by Hamilton to coordinate her travel with Plaintiff's travel; monthly statements by Hamilton referring to Plaintiff and herself as "non-practicing lesbians"; Hamilton stating that if Plaintiff changed her hairstyle Hamilton would ask her out on a date; Hamilton crawling into bed with Plaintiff one morning; Hamilton's brief touching of Plaintiff's arm while the two slept in the same bed; Hamilton questioning Plaintiff's agreement to marry a male friend after she had been drinking; and Hamilton's statement, when discussing the investigation concerning Plaintiff's use of her work cell phone, that she "loved" Plaintiff and "wanted to be friends". Plaintiff alleges that all of these acts occurred as a result of Hamilton's sexual attraction to her, and when rejected, resulted in the adverse employment actions culminating in Plaintiff's termination.

The Supreme Court has directed courts "to determine whether an environment is sufficiently hostile or abusive by 'looking at the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

20

offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (citation omitted). The Supreme Court explained that "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" Id. at 788 (citation omitted). Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. (citation omitted). The Supreme Court further explained that:

> These standard for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." We have made it clear that conduct must be extreme to amount to a charge in the terms and conditions of employment . . ..

Id. (citations omitted).

Despite Plaintiff's beliefs about Hamilton, the Court concludes that Plaintiff has not submitted sufficient evidence that Hamilton was motivated by a sexual desire for Plaintiff. Plaintiff fails to provide any evidence that Hamilton is a homosexual or that she has sought to be in a homosexual relationship. Further, the cited conduct and statements are too vague and speculative to be construed as motivated by sexual desire for Plaintiff. Moreover, Sarah Beth Davis, the one witness that Plaintiff refers to as present for Hamilton's "non-practicing lesbians" comments, denied hearing this or any inappropriate language from Hamilton. As Plaintiff fails to present evidence that Hamilton is homosexual, Plaintiff is unable to prove that Hamilton sexually harassed Plaintiff based upon her sexual desire for Plaintiff. Yet, even if Plaintiff's statements

21

were sufficient evidence to infer that Hamilton was a homosexual, the Court concludes Plaintiff fails to meet her burden of establishing a *prima facie* case of harassment. See King v. Super Serv., Inc., 68 Fed.Appx. 659, 663 (6th Cir. 2003).

Plaintiff cites Hamilton's "excessive" number of telephone calls to her over the years, but Plaintiff's telephone records do not support this contention. Plaintiff's records reflect that in 2005, the minutes of telephone conversations initiated by Hamilton and by Plaintiff were roughly the same. These facts show two women, who had a friendship at the time, and called each other at roughly the same frequency. Plaintiff only supplied one month of records for 2006 and 2007 that reflect Hamilton averaged only nine minutes per call with Plaintiff. Yet, Plaintiff does not prove that the content of these conversations was of a sexual or romantic nature.

As to Hamilton coordinating her travel to Memphis with Plaintiff, both women supervised employees in Memphis and were required to travel there for work. Plaintiff fails to demonstrate that this travel is an unusual occurrence. Plaintiff also invited Hamilton to stay with her in her hotel room in Tunica on at least two occasions. As to Hamilton briefly touching Plaintiff's arm while the two slept, Plaintiff stated that she was unsure whether Hamilton was even awake, as Hamilton's eyes were closed, and that Hamilton rolled away from her immediately after a "one or two second" touch on the arm. Moreover, Plaintiff did not complain about these occurrences for several years. Plaintiff fails to cite any evidence that anyone at work heard Hamilton state that the two were non-practicing lesbians. Further, Plaintiff fails to show such alleged statement to be anything more than an isolated incident of teasing. The Court also finds Hamilton's questioning of Plaintiff's engagement to a friend after she had been drinking also fails to establish harassing conduct.

22

Plaintiff next asserts that Hamilton stated that she "loved" Plaintiff and would give up her job for Plaintiff. This statement was made in reference to an internal investigation over Plaintiff's work phone usage. Plaintiff does not allege that this statement was made in a romantic way as Plaintiff states that Hamilton wanted them to remain as friends.

Plaintiff has failed to present proof of a work environment that a reasonable person would find subjectively offensive as sexually hostile or abusive. The acts cited by Plaintiff occurred over a span of four years. The described events were infrequent, were not severe, nor physically threatening to establish a hostile work environment. Hamilton's cited conduct does not constitute severe or pervasive behavior. Plaintiff's perceptions of Hamilton's conduct are insufficient to establish a *prima facie* case of sexual harassment.

Accordingly, under the totality of the circumstances, the Court concludes that Plaintiff fails to present sufficient evidence that she was subjected to sexual harassment or conduct that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.

Moreover, Defendant asserts its Faragher/Ellerth affirmative defense, citing its immediate and corrective action as to Plaintiff's allegations. In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1988), the Supreme Court stated:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid hard otherwise.

23

Id. at 765.

A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761; see Pennsylvania State Police v. Suders, 542 U.S. 129, 148-152 (2004) (Faragher/Ellerth affirmative defense available where plaintiff alleged sexual harassment resulting in constructive discharge).

On June 22, 2009, Plaintiff filed her complaint with DCS, citing her claim of sexual harassment. DCS initiated an investigation the next day. Prior to this date, Plaintiff had not made any allegations of sexual harassment. Plaintiff served her one-day suspension on July 8, 2009, but did not return to work and took six months of unapproved sick leave. The latter resulted in her termination in September 2010 when she failed to return to work as directed on June 25, 2010. Thus, the Court concludes that Plaintiff unreasonably failed to take advantage of preventative opportunities offered to her; waited years to complain of any alleged sexual harassment; and failed to take advantage of the investigative process as she failed to return back to work.

Accordingly, for these reasons, the Court concludes that Defendant's motion for summary judgment on Plaintiff's sexual harassment claim should be granted.

## B. RETALIATION CLAIM

As to Plaintiff's retaliation claims, under §704(a) of Title VII, retaliation against an employee for exercising the employee's rights under Title VII is itself a discriminatory employment practice, and can be proven with either direct or indirect evidence of the discriminatory action. 42 U.S.C. § 2000e-3(a). As Plaintiff does not present direct evidence of

retaliation, Plaintiff must prove her claim using the McDonnell Douglas burden-shifting framework.

To establish a *prima facie* showing of retaliation, Plaintiff must prove: (1) that she engaged in an activity protected by Title VII; (2) that the exercise of her civil rights was known to the defendant; (3) that thereafter the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). As to the third element, an adverse employment action is an action sufficiently severe to "dissuade a reasonable worker from making or supporting a complaint or charge of discrimination." Burlington Northern & Santa Fey Ry. Co. v. White, 548 U.S. 53, 57 (2006). "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Nguyen, 229 F.3d at 563. Temporal proximity alone is insufficient to establish a causal connection. Id. at 566-67.

Here, Plaintiff fails to present any evidence of a causal connection between her protected activity and her suspension and termination. Plaintiff first engaged in protected activity on June 22, 2009, when she filed an internal complaint. Plaintiff, however, received a recommendation of suspension on June 15, 2009, a week prior to filing her complaint. Plaintiff went on leave on July 9, 2009, and never returned to work, resulting in her termination in September 2010.

A Title VII "plaintiff is not shielded from legitimate discipline because he [or she] filed a charge of discrimination." Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 (6th Cir. 1984) cert. denied 478 U.S. 1006 (1986) (citing Brown v. Ralston Purina Co., 557 F.2d 570, 572

25

(6th Cir. 1977)). To be sure, "an employer may not use what theoretically may be a legitimate cause for discipline as a pretext for what is in reality retaliation against an employee for engaging in an activity protected under Title VII." Id. at 378.

The Court concludes that Plaintiff's proof does not show a causal link between her protected activity on her claim and her suspension and termination that is sufficient to support a judgment. Moreover, Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff has not demonstrated with any supporting evidence that this articulated reason was a pretext for Defendant's alleged retaliatory conduct. Therefore, the Court concludes that Plaintiff's retaliation claim fails.

Accordingly, for these reasons, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 11) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the _21st_ day of August, 2012.

WILLIAM J. HAYNES, JR.
Chief United States District Judge

26